**Nancy PIEDIMONTE, Respondent,**

v.

**Kellynn G. (Spencer) NISSEN, Appellant.**

**No. WD 43592.**

Missouri Court of Appeals, Western District.

Sept. 24, 1991.

Lloyd Koelker, Kansas City, for appellant.

William D. Piedimonte, Independence, for respondent.

J. Scott King, Independence, guardian ad litem.

Before KENNEDY, P.J., and SHANGLER and FENNER, JJ.

SHANGLER, Judge.

This proceeding commenced in the probate division of the circuit court of Jackson County as a petition by Nancy Piedimonte for appointment as guardian of the person of E.G.S., a child of eight years, under Chapter 475, RSMo 1986. The ground alleged was that the mother, Kellynn Nissen, was unfit for the duty of guardianship. *See* §§ 475.045.1(1), 475.060(10). The petition for appointment of guardian was also submitted as a pleading for child custody determination by the court under the Uniform Child Custody Jurisdiction Act [UCCJA], §§ 452.440 to 452.550, RSMo 1986. The ground alleged for the exercise of jurisdiction under the UCCJA were in terms of § 452.450.1(3)(a) & (b):

> (3) The child is physically present in this state and:
>> (a) The child has been abandoned; or
>> (b) It is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse, or is otherwise being neglected ...

The court determined that jurisdiction existed to act under the UCCJA, undertook to exercise that jurisdiction, found the issue of custody in favor of the petitioner Piedimonte, and appointed her guardian of the person of the child E.G.S. The mother Kellynn Nissan appeals from that order. She contends that the court was without jurisdiction to act under the UCCJA.

The subject of the custody controversy, E.G.S., is the daughter of Kellynn Nissen and Robert Stockton who were never married. They are both married to other persons. She resides in Oregon, and he in New York. Kellynn has not seen her husband Nissen for several years. For the past three years, Kellynn has lived in Oregon with Rick Carr, E.G.S. and her other daughter, A., as a family.

The parents of the natural father, Don and Betty Stockton, live in Fargo, North Dakota. They have regularly visited E.G.S. since 1982, and had summer visitation with her in North Dakota. The petitioner here, Nancy Piedimonte, is their daughter, and the aunt of E.G.S. In recent years, she and her husband arranged their visits to the Stocktons to coincide with those of the child. In the summer of 1989, E.G.S. went to North Dakota for a visit with the Stockton grandparents. She arrived on July 15 and was to return to Oregon on August 1. During this visit, E.G.S. complained that her teeth hurt, and grandfather Stockton noticed that she had not been given any dental treatment since the year before. On July 31, the Stocktons asked the mother to extend the visit for one more week for Aunt Nancy Piedimonte to take the child to see a dentist in Blue Springs, Missouri, and Kellynn consented.

That approval was for just one visit to the dentist. When that time passed and the child still had not been returned, Kellynn telephoned the Stocktons, as did her father, and was told that the child would be returned after the dental work was completed. Kellynn then by letter revoked both her permission to have E.G.S.'s dental care done in Kansas City and her permission for E.G.S. to remain there. She mailed the revocation separately to the dentist, the grandparents, and to Nancy Piedimonte by registered and return-receipt delivery. Nancy Piedimonte refused the letter because, as she acknowledged, her parents had received the letter and it expressed Kellynn's disapproval of what they were doing and her demand that the child be returned. E.G.S. was never returned and on September 7, 1989, Kellynn filed a missing persons report with Oregon law enforcement authorities.

During this period with E.G.S., Nancy Piedimonte discovered that the child's reading skills were deficient. She observed also that the child lacked a general concern about her personal hygiene. Those considerations, along with the child's unsuitable home conditions in Oregon led the Stocktons and Piedimontes to the family decision to "enter her into school in Blue Springs while she was undergoing this dental treatment." Before the school year began, Nancy mailed a written consent form to Kellynn that would have allowed E.G.S. to stay with her, but Kellynn never returned it. Nancy acknowledged that after the week extension given by Kellynn was over, she had no doubt that the mother wanted her child back.

On September 15, 1989, Nancy Piedimonte filed the petition for appointment of guardian in the probate division of the circuit court. Days later, officers from the Blue Springs Police Department took E.G.S. into custody under the missing persons report from Oregon for return to that state. That prompted the petitioner Piedimonte on September 29, 1989, to apply for the emergency appointment of a guardian ad litem to prevent the transport of the child outside the state pending a hearing to "determine the child's best interests pursuant to the Uniform Child Custody Jurisdiction Act." This pleading alleged, *inter alia*, that the minor child E.G.S. was in the actual custody of the applicant Piedimonte, that the natural mother "voluntarily relinquished custody to Nancy Piedimonte," and that "[t]hereafter, after investigation, applicant determined that the minor child had been neglected and abused causing applicant to file her petition for appointment of guardian of a minor."

On September 29, 1989, the very day of the application, the probate court entered its emergency order and appointed Nancy Piedimonte as guardian ad litem of the child E.G.S., who was ordered into her custody. The court also appointed Scott King, Esquire, additional guardian ad litem to represent the minor's interests in all further proceedings.

On October 20, 1989, the mother Kellynn Nissan moved the court to quash the emergency order of appointment of Nancy Piedimonte as guardian ad litem of E.G.S., and for the order of the court "declining jurisdiction of this child custody matter pursuant to the Uniform Child Custody Jurisdiction Act." Then, in her answer to the petition for appointment of guardian, the mother again raised the issue of jurisdiction. The memorandum of suggestions filed by guardian ad litem Nancy Piedimonte reasserted the jurisdiction of the court to act under the emergency provision of § 452.450.1(3) of the UCCJA. The motion for the court to decline jurisdiction under the UCCJA was overruled on January 8, 1990.

On March 28, 1990, the mother Kellynn Nissen moved, under § 452.530 of the UCCJA, for a request to the Oregon court for a social study and evaluation of the Nissen home to assist the probate court's determination as to her suitability as custodian of her child E.G.S. The court sustained the motion. It formally requested Oregon for the study and report by May 15, 1990, a date prior to the scheduled hearing on the Piedimonte petition for appointment as guardian. The report was never submitted, apparently because the request was never received.

The trial on the petition for appointment of guardian for E.G.S. commenced on May 30, 1990. The mother Kellynn Nissen again challenged the jurisdiction of the court over the custody matter and reasserted the grounds in the October 20, 1989, motion. The guardian ad litem Piedimonte, in turn, reasserted the jurisdiction of the court to act in terms of the memorandum previously filed. The numerous witnesses included guardian ad litem Nancy Piedimonte, the Stocktons, Kellynn Nissen and guardian ad litem King. Other witnesses were Dr. John Smith, the treating dentist, Margaret Kinney, E.G.S.'s first grade teacher in Blue Springs, Dr. Barry Hughes, clinical psychologist, and, by deposition, Gary Frazier, principal of the Oregon school E.G.S. attended. Kellynn's father and sister also testified.

On June 5, 1990, the court sustained the petition, found the mother Kellynn unfit to have custody of E.G.S., and appointed Nancy Piedimonte guardian to have custody and control of the child. The court found also that the evidence was insufficient to address the issue of visitation between E.G.S., her mother Kellynn, and sister A. That question was deferred to "a later time," but was never addressed.

The formal judgment issued with findings of fact and conclusions of law. The findings were for the most part discursive resumes of the testimony of the Stockton grandparents, Nancy Piedimonte, the mother Kellynn Nissen, the dentist Dr. John Paul Smith and were expressed as inferences of fact. Those facts bore on the home situation in Oregon, the relationship between Kellynn Nissen and Rick Carr—with whom she and the children lived—the lack of attention by the mother Kellynn to the physical and educational needs of the child E.G.S., and the responses to those needs by the Stockton grandparents and Nancy Piedimonte.

The home situation in Oregon and the personal habits of Kellynn Nissen Carr and Rick Carr, with whom she and the girls lived as a household, and their interrelationships, was one center of the court's adjudication of the facts. The other was the child herself.

Rick Carr, the court found, was obligated for child support to his own children, and so had little with which to provide for Kellynn and the two girls. Although presently employed at $7.50 per hour, his work history was not that of steady employment. He is subject to episodes of alcohol abuse and has used marijuana. The court noted that although Kellynn "objected to Rick's excessive drinking, she did not testify that she

objected to his using marijuana or to bringing it into the home." The court adopted, "as an equally permissible inference," that Rick continues to use alcohol. The court concluded also, from the ability of the girls E.G.S. and A. to identify the odor of marijuana smoke, that "a member of the household smoked the drug regularly." This condition of smoke-laden air, the court found, presented a "direct threat to the girls' health," and the "dangerous combination" of drugs and alcohol permitted the inference that "Rick became physically violent or abusive on more than one occasion."

In 1985 Kellynn arrived in Oregon. The court found that there was no reason why she did not work until 1987, since she was physically healthy. In 1987, she worked in a cafe for six months but has since been on public assistance. Kellynn explained that she had not taken E.G.S. to the dentist after the Stocktons discovered her severe tooth decay in 1988 because E.G.S. "was scared to death of dentists." She explained also that she did not then have a medical card or enough money for the dental treatment.

Dr. John P. Smith, the dentist to whom Piedimonte took E.G.S. in August of 1989, found six decayed baby teeth and two permanent molars with deep decay. He removed the decay and performed a pulpotomy to remove the nerves from the two permanent teeth and installed fillings. It will be necessary to perform root canals on these teeth when E.G.S. reaches the age of ten because the decay had penetrated through the teeth to the nerves.

The court found also that E.G.S.'s reading skills were extremely poor. That—as well as the testimony of Gary Frazier from the Oregon school that he observed E.G.S. was often unclean and was sent home because of head lice—was evidence to the court of Kellynn's "lack of concern or interest." It amounted to an "apparent abdication of parental responsibility to assure that E.G.S. was making good progress in school." The court rejected the contention of the mother that "her parental failings [were the] result of lack of funds." The court found that Kellynn offered "no plausible excuse for not obtaining employment" but chose, rather, to rely upon public assistance and the charity of the Stocktons for most of 1988 and 1989. The court found that Kellynn's lack of attention to the child's dental health constituted "medical neglect." The court concluded that "E.G.S.'s poor hygiene coupled with her severe dental problem supports the inference that [Kellynn] has been consistently indifferent to E.G.S.'s health and well-being."

The court determined that it was "in E.G.S.'s best interests to grant [Nancy Piedimonte] custody" of the child. Nancy Piedimonte's fitness as custodian was demonstrated by her attention to E.G.S.'s "physical and emotional needs" and by "providing E.G.S. with the stability and affection which has been demonstrably lacking in her life with her mother in Oregon," explained the court. The order of custody issued accordingly.

■ Section 452.445(2) of the UCCJA provides that, as used in the Act, a proceeding for the appointment of a guardian of the person is a "custody proceeding." *See In re Estate of Patterson,* 652 S.W.2d 252, 254[1, 2] (Mo.App.1983). The court rested upon that section not only for its determination that the UCCJA applied to the guardianship proceeding, but also for its authority to adjudicate the petition by Nancy Piedimonte for the custody of the child E.G.S. That section, however, is a glossary of terms. It tells how the terms are to be understood as used in the text of the Act, but does not establish jurisdiction.

That is the function of § 452.450. **Jurisdiction:** [1]

"1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if: ..."

The grounds that the petitioners alleged to the court, among the alternatives for the assumption by this state of jurisdiction for that purpose, were those enabled by § 452.-

---

**1.** The complete text of jurisdiction § 452.450 is rendered in Appendix A.

450.1(3)(a) & (b). They express the principle that under the Act jurisdiction may be found over a child who is physically present in this state and has been abandoned or, as a matter of emergency, needs to be protected from mistreatment, abuse or neglect. The findings of fact and determinations of law that explain the formal judgment, however, address neither the validity of the grounds asserted for jurisdiction, nor the efficacy of the evidence as proof of the grounds, nor the reasons for the exercise of jurisdiction. There is finding neither of abandonment nor of emergency. Nor does the judgment otherwise explain the section of the UCCJA jurisdiction by which the court undertook to adjudicate.

■ It is implicit in the scheme of the UCCJA that the court make an initial determination of jurisdiction by express findings of fact before proceeding to the substantive issue of custody. *State ex rel. Laws v. Higgins*, 734 S.W.2d 274, 277[1, 2] (Mo. App.1987). That is because the efficacy of the UCCJA to accomplish its purpose, to avoid the harm that comes to children from competition between states for jurisdiction in custody adjudications, depends upon a judgment that is fully informed—and valid. It is only "[a] custody decree rendered by a court of this state which had jurisdiction under section 452.450" that binds the parties under the UCCJA. § 452.495. It is only a custody decree of a court which "ha[s] assumed jurisdiction under statutory provisions substantially in accordance with [the UCCJA], or *which was made under factual circumstances meeting the jurisdictional standards of [the UCCJA]*" that the courts of another state are bound to recognized and enforce. § 452.500 [emphasis added]; *In re B.R.F.*, 669 S.W.2d 240, 243 (Mo.App.1984); *Bell v. Bell*, 682 S.W.2d 892, 895[3] (Mo.App.1984). Thus, a ruling of jurisdiction by a court that is merely conclusory or that assumes jurisdiction, but is tacit as to the factual basis for that adjudication, does not meet the objectives of the Act. *Lynch v. Lynch*, 770 P.2d 1383, 1385[3–5] (Colo.App.1989); *Application of Pierce*, 184 Mont. 82, 601 P.2d 1179, 1183[5–8] (1979). *See also Jerson v. Jerson*, 68 N.C.App. 738, 315 S.E.2d 522, 523[4] (N.C.App.1984).

There was no evidence to support the assumption of jurisdiction by the probate court to determine custody under § 452.-450.1(3)(a) & (b) of the UCCJA, the only grounds pleaded. Nor can either the "emergency order" for appointment of the petitioner Nancy Piedimonte guardian ad litem of the child or her permanent appointment as guardian be explained as an assumption of jurisdiction under either of those provisions, the only grounds tendered to the court. There was no evidence that the child was abandoned or needed the protection of the court as a matter of emergency, the only bases for the assumption of jurisdiction under those provisions.

It was the actual testimony of the petitioner Nancy Piedimonte, rather, that despite the declaration in her affidavit, the original filing in the proceeding, that the jurisdiction of the court "[was] necessary to protect said child as she has been abandoned," she did not believe then or thereafter that the mother had abandoned the child. The sequence of events that brought E.G.S. into the physical custody of the petitioner Piedimonte is not contested. The child came to Missouri with her aunt for dental work. The mother Kellynn agreed to extend the two week visitation for that purpose, but just for an additional week. The mother also sent her Oregon medical care identification card for that purpose. The mother was then told that the child would not be returned until the full dental regimen was completed. Thereupon, by separate letters to the dentist, the grandparents and to Piedimonte, she revoked the permission for dental treatment. Nancy Piedimonte has kept the child since, despite the repeated requests, and then pleas, of the mother for her return. The mother reported the child as a missing person to the Oregon authorities, but her return was interrupted by the "emergency order" of appointment of Nancy Piedimonte as guardian ad litem of the child, and then by the permanent order of custody entered by the probate court.

*Abandonment* of a child by a parent means the intentional relinquishment of the custody of a child to another with the intention never again to claim parental rights or to perform parental duties. It entails a positive act, such as desertion, or delivery of the child that intends a permanent severance of the parental relationship. *In re Trapp,* 528 S.W.2d 489, 495[2] (Mo. App.1975). The evidence does not show abandonment. Thus, the order of custody entered by the probate court cannot be sustained as an exercise of jurisdiction under paragraph (a) of § 452.450.1(3) of the UCCJA.

Nor can the order of custody be sustained as an exercise of jurisdiction under paragraph (b) of that provision of the UCCJA. A court acts on that ground only in cases of emergency neglect. The assumption of jurisdiction under paragraph (a) or (b) gives expression to the obligation of the state as *parens patriae,* usually exercised by a juvenile court, to protect a child physically present within its bounds regardless of domicile. *E.P. v. District Court of Garfield County,* 696 P.2d 254, 258[1–4] (Colo. banc 1985); *See* § 211.031.1, RSMo Supp.1991. Thus, it is an extraordinary jurisdiction reserved for extraordinary circumstances. When there is child neglect without emergency or abandonment, jurisdiction cannot be based on these paragraphs. *See* Commissioners' Note, UCCJA § 3, 9 U.L.A. 145 (1988).

The exercise of the *parens patriae* power to make a child custody determination under these provisions is limited to cases of grave emergency affecting the immediate welfare of the child. *Brock v. District Court of County of Boulder,* 620 P.2d 11, 14[3, 4] (Colo.1980). It is justified only where the harm from the neglect is immediate or imminent. *State in Interest of D.S.K.,* 792 P.2d 118, 127[15] (Utah App. 1990); *Marks v. Marks,* 281 S.C. 316, 315 S.E.2d 158, 162 (App.1984). This special emergency power to protect the child, moreover, confers a *temporary* jurisdiction only. It does not empower the state to make a permanent custody disposition, or to modify the decree of a court with continuing jurisdiction. *Iacouzze v. Iacouzze,* 137 Ariz. 605, 672 P.2d 949, 951[6] (App. 1983), *aff'd* 137 Ariz. 584, 672 P.2d 928 (banc 1983); *State in Interest of D.S.K.,* 792 P.2d at 127[16]. Where the evidence shows that an imminent physical or emotional danger awaits the child upon return to the custodial parent, the court may exercise its *parens patriae* jurisdiction by temporary protective order to preserve the status quo for such limited time as will enable the petitioner to apply for permanent custody in the state with regular jurisdiction under the UCCJA. *Nussbaumer v. Nussbaumer,* 442 So.2d 1094, 1097 [3, 4] (Fla. App.1983). *See also* Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA,* 14 Fam.L.Q. 203, 225–26 (1981).

The affidavit presented by Nancy Piedimonte to the probate court with her original petition for appointment as guardian of the child invokes the jurisdiction of the court to adjudicate custody under the UCCJA, but does not identify the section that empowers the assumption of jurisdiction. It avers that "said child [E.G.S.] is physically present in the State of Missouri and it is necessary to protect said child as she has been abandoned and *said child has been subject to neglect.*" [emphasis added] Thus, the affirmation of the affidavit—that the child physically present in the state has been abandoned—is in the exact terms for the assumption of jurisdiction under paragraph (a) of § 452.450.1(3), but the rest of the recitation—that the child has been subject to neglect—is only a paraphrase of paragraph (b). The assumption of jurisdiction for that exercise of extraordinary *parens patriae* power under that paragraph of the UCCJA rests on *emergency,* and not on ordinary neglect. It is a ground, moreover, that the original filing for UCCJA jurisdiction neither pleads, nor the evidence sustains, nor the court finds as the basis for its exercise of jurisdiction and judgment.

On oral argument, the petitioner argued insistently that the condition of the child as then present in Missouri, her urgent need for dental attention to repair the state of

severe tooth decay, constituted an "emergency," and thus was a legitimate ground for the assumption of jurisdiction by the court under paragraph (b) of § 452.450.1(3). The determinations of fact that inform the judgment of custody entered by the court, however, do not find an "emergency," either as to the need of the child for dental care, the correction of her reading deficiency, the home conditions with the mother in Oregon, or as to any other aspect of the proof.

 The court found, rather, that the mother's "lack of attention to [the child's] dental health constitutes medical neglect." Had the evidence shown, nevertheless, a condition of dental decay so critical as to constitute an emergency threat to the health of the child, it could not have justified the exercise of jurisdiction under the UCCJA for a determination of permanent custody. Once the imminent threat to health was met by treatment, the emergency spent, and the *parens patriae* function of the court was completed under the UCCJA. *Nussbaumer v. Nussbaumer*, 442 So.2d at 1097; *State in Interest of D.S.K.*, 792 P.2d at 127[17, 18]; *In re Marriage of Schwander*, 79 Cal.App.3d 1013, 145 Cal.Rptr. 325, 329[2, 3] (1978). The evidence shows clearly that the regimen of dental care needed to relieve any emergency was completed long before the judgment which changed permanent custody was entered by the probate court. It is doubtful, in any event, that such an "emergency" could have been found under the evidence. The mother not only approved the treatment of the child by a dentist, but also provided her state medical card to assist payment. She had also already given the grandparents Stockton her written permission for any emergency medical treatment of the child during the period of her scheduled stay with them. There was no explanation—other than as an overture to wrest permanent custody—why there was resort to the court for that purpose rather than to the permission already in hand. The evidence is uncontradicted that only when it became clear to the mother that, despite the extension of the holiday stay to allow dental treatment, Nancy and the grandpar-

ents did not intend to return the child to her did she withdraw her permission for any further stay.

Nor can the earlier promulgation of "emergency order" for appointment of the petitioner Nancy Piedimonte as guardian ad litem of the child be explained as an assumption of jurisdiction under § 452.-450.1(3)(a) or (b), the only grounds tendered to the court by the initial pleading. The "emergency" presented to the court for its order was not a child abandoned or in exigent need of protection from mistreatment or threat of abuse in Missouri, but the "emergency" of imminent return to her mother in Oregon as a recovered missing person. The "emergency order" of appointment of guardian ad litem was determined peremptorily, without evidence [other than affidavits, more hearsay than on knowledge], without findings of fact, and without a found ground of jurisdiction, although formally questioned by the mother.

It becomes evident, ultimately, from the responses by Nancy Piedimonte to the motion of the mother to quash the "emergency order" for want of jurisdiction and from her arguments on appeal, that the "emergency" she posits was the "mistreatment, abuse and neglect" to which the child was subjected in the State of Oregon, and which awaits upon her return to the custodial parent. The argument refers to evidence which included: the failure to provide for adequate dental care, the inability of the child to read, the lack of concern by the mother for the personal hygiene of the child, the home environment in Oregon with the mother's male companion who abused alcohol and sometimes was violent with the mother, the crude and cramped living quarters without running water or bathing facilities and other evidence that was before the court. It was for those very reasons, the argument concludes, "why Oregon is not the proper jurisdiction to litigate this matter."

Where the evidence shows that an imminent physical or emotional danger awaits the child upon return to the custodial parent, the court may indeed exercise its protective emergency *parens patriae* jurisdic-

tion under § 452.450.1(3)(a) or (b) of the UCCJA. *Nelson v. Nelson,* 433 So.2d 1015, 1019[2] (Fla.App.1983). An "emergency" of that kind does not exist, however, because the custodial home lacks running water, or even electricity, or other such common amenity. *Lynch v. Lynch,* 770 P.2d at 1386[6, 7]. Nor does the unsettled life of the mother or her use of marijuana, as such, pose the danger to the child that compels exercise of emergency jurisdiction under § 452.450.1(3). *Ehr v. Ehr,* 77 Ill. App.3d 540, 33 Ill.Dec. 11, 16, 396 N.E.2d 87, 92[7–9] (1979). That the neglect, or even mistreatment, of the child may be a consequence of the cohabitation of the custodian mother with a man who is not her husband does not necessarily present that kind of threat of harm that justifies the exercise by a court of the extraordinary *parens patriae* jurisdiction under the Act. *State in Interest of D.S.K.,* 792 P.2d at 121[1]; *Nelson v. Nelson,* 433 So.2d at 1016.

The findings by the trial court on the very evidence the petitioner Piedimonte argues, however described, were of ordinary neglect. There was no finding of an imminent or grave harm that awaited the child upon her return to her home in Oregon, or of other emergency. There was—it must be said again—no basis for the exercise of jurisdiction under the extraordinary *parens patriae* power that the UCCJA reserves for extraordinary circumstances, nor could the court have validly adjudicated the award of permanent custody on that ground. That is because the power of a court to adjudicate custody based only on the physical presence of the child in the forum is denied by the UCCJA.[2]

Notwithstanding, the record is clear that the proceeding by Nancy Piedimonte under chapter 475 for appointment as guardian of the child was from first to last a determination not only of custody, but of permanent custody. The abandonment and neglect of a child physically present in the forum were pleaded to prove that because of the home conditions in Oregon, the mother was "unfit or unwilling to assume the duties of guardianship." That was the express basis for the judgment of the probate court that granted Nancy Piedimonte permanent custody of the child as her guardian. In effect, the order of guardianship entered by the probate court terminated the parental right on a finding of ordinary neglect without opportunity for the mother to rehabilitate the neglect or even the prelude of supervision and investigation that the law prescribes for an order of custody on that ground. §§ 211.031.1(1)(a), 211.181.1(1) & (2), 211.447.2(2) & (3), RSMo Supp.1990. It arrogates the presumptive exclusive jurisdiction that the Juvenile Code reserves to the juvenile court to determine the need of a child for care and treatment because of the neglect of a parent, but without its meliorative methods. §§ 211.031.1, 211.-051. *See also State ex rel. Dubinsky v. Weinstein,* 413 S.W.2d 178, 182[6, 7] (Mo. banc 1967).

The postulate the petitioner argues, and the judgment adopts—that the evidence of abuse and neglect of the child in Oregon "is the very reason why Oregon is not the proper jurisdiction to litigate this matter"—betrays a fundamental error as to the purpose and policy that inform the Act. The jurisdictional requirements of the UCCJA are designed to increase the probability that a custody decision will be in the best interests of the child by vesting the decision in the court with the greatest access to relevant information about the child and family. *In re B.R.F.,* 669 S.W.2d at 246[3, 4]; *Elliott v. Elliott,* 612 S.W.2d 889, 893[5] (Mo.App.1981); *Neger v. Neger,* 93 N.J. 15, 459 A.2d 628, 635[5, 6] (1982).

---

**2.** That basic design of UCCJA jurisdiction section 452.450 supersedes the former rule given in *Kennedy v. Carman,* 471 S.W.2d 275, 282 (Mo. App.1971) that the physical presence of the child was a sufficient basis for the forum "to determine the custody, or to appoint a guardian, of the person of the child." *See* J. Krauskopf, *Child Custody Jurisdiction Under the UCCJA,* 34

Mo.B.J. 383, 384 (1978); B. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA,* 14 Fam.L.Q. 203, 204 (1981) and *In re Custody of Holman,* 77 Ill.App.3d 732, 33 Ill.Dec. 106, 396 N.E.2d 331 (1979) and *In re Marriage of Ben–Yehoshua,* 91 Cal.App.3d 259, 154 Cal.Rptr. 80 (1979).

■ To that end, the Act prefers that jurisdiction to adjudicate custody be in that state with the most significant connections with the child and family. The Act places jurisdiction first in the home state. *Home state* is defined as "the state in which, immediately preceding the filing of the custody proceeding, the child lived with his parents, a parent, an institution, or a person acting as parent, for at least 6 consecutive months." § 452.445(4). Jurisdiction lodges under this definition also if the state "[h]ad been the child's home state within six months before commencement of the proceeding and the child is absent from this state for any reason, and a parent or person acting as parent continues to live in [the] state." § 452.450.1(1)(b). Under the evidence, only Oregon qualifies for *home state* jurisdiction. The essential purpose of these provisions is to "preclude any court action to determine custody in the state of Missouri unless the child has lived here six months, *i.e.*, [Missouri] would not be a haven for child snatchers from other jurisdictions." J. Krauskopf, *Child Custody Jurisdiction under the UCCJA*, 34 Mo.B.J. 383, 385 (1987).

■ The Act places jurisdiction next in the state where "[t]he child and his parents, or the child and at least one litigant, have a significant connection with this state; and [t]here is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships." § 452.450.-1(2)(a), (b). The critical elements in the determination of jurisdiction under that provision are *significant connection* and *substantial evidence*. *In re B.R.F.*, 669 S.W.2d at 247[5]. In that assessment, "presence of the child for a visit or with a snatching parent [or litigant] negates 'significant connection' jurisdiction." B. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, 14 Fam.L.Q. 203, 204 (1981); and *See* Commissioners' Note, UCCJA §§ 3(a)(2) & 3(b), 9 U.L.A. 144–45 (Master ed. 1988). In those terms, the connection of the child with Missouri at the commencement of the probate court custody proceedings was only adventitious and without any significance as a predicate for custody jurisdiction. The child was there for one week for dental treatment while on visitation with the family of the natural father. There is no intimation the child had ever been in Missouri before. That single episode did not constitute a "significant connection" with this state within the meaning of § 452.450.1(2)(a). *State ex rel. Laws v. Higgins*, 734 S.W.2d at 279[9, 10].

The petitioner argues nevertheless that the mother Kellynn "voluntarily relinquished custody of the minor child" to her, presumably to validate her continued retention since as a "significant contact," and hence the jurisdiction to adjudicate custody. The assertion by Nancy Piedimonte was also a declaration to the court in her Emergency Application for Appointment of Guardian Ad Litem. The trial court, as we note, made no finding of the facts upon which it rested the exercise of jurisdiction under the UCCJA, either in the adjudication of the emergency application or in the petition for permanent custody as guardian because of the unfitness of the mother. There was, however, no evidence—none— for an inference that the mother voluntarily relinquished custody to aunt Nancy Piedimonte, even for a moment. The child was with Nancy Piedimonte in Missouri with the express consent of the mother for one week for dental treatment. When the week passed, Nancy refused to return the child to the mother, although she had no doubt that the mother wanted the child back. In Nancy's own words: "Well, in the beginning, when we were getting her teeth worked on, she had given us permission." At the end of that week, "there was no doubt in [her] mind that Kellynn wanted [E.G.S.] back in Oregon." The family, including Nancy, had made the "joint decision", nevertheless, not to send the child back. Instead, Nancy enrolled the child in a local school—although the mother never gave the permission requested—refused a letter from Kellynn because she knew that it was "disapproving with us keeping [E.G.S.]," monitored the telephone calls by the mother to the child, and determined when the child would speak with her.

■ However lofty the purpose and benign the concern that motivated her conduct, the argument that the mother "voluntarily relinquished custody" of the minor child to Nancy Piedimonte is sham. A noncustodial litigant may not establish jurisdiction for an initial decree of custody in a new state by snatching or retaining the child after an out of state visit and then creating a "significant connection" between the child and the new state. *Vorpahl v. Lee*, 99 Wis.2d 7, 298 N.W.2d 222, 224[1, 2] (App.1980); *Mattleman v. Bandler*, 123 N.H. 368, 461 A.2d 561, 564[3] (1983). Rather, the spirit of "significant connection" 452.450.1(2) is to discourage unilateral removal or retention of a child from her present home and to prevent relitigation of custody "that shifts the child from state to state." *Mattleman v. Bandler*, 461 A.2d at 564[4].

■ Under the evidence, only Oregon qualifies as the state that bears *significant connection* with the child. It is the forum that has the optimum access to relevant evidence about the child and family. That is where the child has her upbringing, schooling, family care, protection and most intimate personal relationships. The connections with the Stockton grandparents in North Dakota and the Spencer grandparents in Iowa are of some significance, but as the choice of forum in the best interests of the child under § 452.450.1(2) of the UCCJA, Missouri is without significance at all. *See State ex rel. Laws v. Higgins*, 734 S.W.2d at 278[6]. The only Missouri contact that bears legitimately upon the jurisdictional requirements of the Act for forum jurisdiction is the presence of the child in Missouri with Nancy Piedimonte for the one week. The evidence of the ministrations to the needs of the child during her wrongful retention in Missouri is not competent to prove significant connection with that forum under the Act. *Vorpahl v. Lee*, 99 Wis.2d 7, 298 N.W.2d at 224[1, 2].

Thus, the judgment of the probate court that awarded permanent custody of the child in Nancy Piedimonte was not an exercise of jurisdiction under significant connection § 452.450.1(2) of the Act.

■ The third source of jurisdiction under the Act—the only provision the petitioner actually invokes—the *parens patriae* emergency ground of custody adjudication, we have already determined was not proven. If the permanent custody awarded to Nancy Piedimonte is meant to respond to the pleadings, it may not stand for the reasons given. It may not stand even had the emergency been proven, other than as a judgment for temporary custody. This is because physical presence of the child alone does not confer jurisdiction under the UCCJA to adjudicate permanent custody in that forum. *State in Interest of D.S.K.*, 792 P.2d at 127[15–18]; *E.P. v. District Court of Garfield County*, 696 P.2d at 62[10, 11].

■ The final possible ground for the assumption of jurisdiction that remains to a forum under the UCCJA is § 452.450.1(4). That provision allows a court of this state which is competent to decide custody matters to assume jurisdiction if no other state could or would assume jurisdiction under any of the other three grounds. *In re B.R.F.*, 669 S.W.2d at 247[8]. This section governs jurisdiction to make an initial decree of custody as well as a modification decree. Commissioners' Note, UCCJA § 3, 9 U.L.A. 145 (Master ed. 1988). The petition by Nancy Piedimonte to the probate court for appointment as guardian of the child was for an initial decree of custody. There was no proceeding concerning the custody of the child pending in a court of another state exercising jurisdiction substantially in conformity with the UCCJA, nor was the child under the continuing jurisdiction of a court of another state with the power to modify a custody decree. §§ 452.465 and 452.505. There is no intimation that the state of Oregon, under the evidence the home state and only forum with the jurisdiction under the Act to adjudicate the custody of the child, would refuse that role. Oregon has enacted the UCCJA. Or.Rev.Stat. §§ 109.700 to 109.-930 (1989). That forum remains open to Nancy Piedimonte.

■ These four grounds of jurisdiction under the UCCJA are all subject to the provisions of § 452.470 and § 452.475. The

former accords to a court with jurisdiction to make an initial or modification decree of custody to decline its exercise if it finds that it is an inconvenient forum and that the court of another state is a more appropriate forum for that determination. A court under § 452.470 may require the party who commenced the proceedings to pay costs, necessary travel expenses incurred by the other party and witnesses, as well as attorney fees, should the court find itself "clearly an inappropriate forum." Section 452.475 codifies the clean hands doctrine. It allows the court discretion to decline exercise of its jurisdiction "if the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct." The court that dismisses a petition under this section may charge the petitioner with necessary travel expenses incurred by the other party and witnesses, as well as attorney fees.

In the trial court, the mother moved to quash the "emergency order" of appointment of Nancy Piedimonte as guardian ad litem of the child for want of jurisdiction under the UCCJA, and otherwise for the court to decline jurisdiction as an inconvenient forum under § 452.470 and because of the reprehensible conduct of the petitioner under § 452.475. The mother sought the money sanctions of travel expenses and attorney fees those sections allow to the wronged party. The trial court denied these motions. They were reasserted in her answer to the petition for appointment of guardian, and now again on appeal.

■ We determine that the denial of the motion to decline jurisdiction and dismiss the petition under § 452.475, was an abuse of discretion, as was the failure to award the mother the necessary travel expenses and attorney fees. The terms "wrongful" and "reprehensible conduct", although left undefined in the Act, encompass unconscionable conduct. It need not mean a violation of a legal right or duty, but conduct that is so objectionable that a court of equity cannot in good conscience allow that party access to its jurisdiction. See Commissioners' Note, UCCJA § 8, 9

U.L.A. 252 (Master Ed.1988); *Williams v. Zacher*, 35 Or.App. 129, 581 P.2d 91, 94, n. 1 (1978). Circumstances that are relevant to that determination, and hence to the propriety to decline jurisdiction by reason of conduct, include the length of time the child was in the jurisdiction used as the forum, the effect on the child of the antics of the wrongful retention, and whether the conduct is a subterfuge to find a friendly forum. In all of this, the bad faith of the petitioner is decisive. *Stokes v. Stokes*, 751 P.2d 1363, 1366[4–7] (Alaska 1988); *Harvey v. Harvey*, 244 Ga. 199, 259 S.E.2d 456 (1979); *Rogers v. Platt*, 199 Cal.App.3d 1204, 245 Cal.Rptr. 532, 537[2, 3] (1988).

The circumstances shown bespeak conduct so objectionable as will not permit a court of equity to open its jurisdiction to the petitioner. The deliberate retention of the child in Missouri beyond the period of consent, the willful refusal to heed the pleas of the mother for her return, the enrollment of the child in the Missouri school without an order of custody and despite lack of consent of the mother, the continued retention of the child even after knowledge that she was a reported missing person, the claim to the probate court that the child was abandoned and neglected to induce its order of temporary custody and so prevent her return to the mother in Oregon—all bespeak conduct so wrongful and blameworthy as to deny such a petitioner access to a court of equity. The jurisdiction of the probate court, moreover, was not engaged with clean hands. The affidavit for initial jurisdiction, that the child was abandoned, was not true. The application for emergency order affidavit, that the mother voluntarily relinquished custody to the petitioner, was not true. They nevertheless put the mother, an indigent on public welfare, to the expense of response and travel to a distant forum or face the loss of her child by default.

The refusal of the trial court to decline jurisdiction not only contravened the policy of the Act, i.e., to deter unilateral removals and retentions of children undertaken to obtain custody awards, but subverted that policy by rewarding self-help. B. Boden-

heimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, 14 Fam.L.Q. 203, 209–10 (1981). The money sanctions for necessary travel expense and attorney fee that § 452.475.3 approves in "appropriate cases" of conduct so culpable is the fiscal concomitant of that policy of deterrence. This is an appropriate case for the petitioner to be made to bear that charge.

The judgment of custody in favor of Nancy Piedimonte is reversed. The cause is remanded with directions to the probate court to enter judgment for the necessary travel expenses of the mother Kellynn Nissen and her witness and for a reasonable attorney fee. The costs of the action are assessed against the petitioner Nancy Piedimonte.

All concur.

## APPENDIX A
### CHILD CUSTODY JURISDICTION
### § 452.450

452.450. Jurisdiction

1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This state:

(a) Is the home state of the child at the time of commencement of the proceeding; or

(b) Had been the child's home state within six months before commencement of the proceeding and the child is absent from this state for any reason, and a parent or person acting as parent continues to live in this state; or

(2) It is in the best interest of the child that a court of this state assume jurisdiction because:

(a) The child and his parents, or the child and at least one litigant, have a significant connection with this state; and

(b) There is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this state and:

(a) The child has been abandoned; or

(b) It is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse, or is otherwise being neglected; or

(4) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction.

2. Except as provided in subdivisions (3) and (4) of subsection 1 of this section, physical presence of the child, or of the child and one of the litigants, in this state is not sufficient alone to confer jurisdiction on a court of this state to make child custody determination.

3. Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.