OPINION OF THE COURT
David B. Saxe, J.
In this internationally flavored divorce and custody matter, a number of interesting and novel issues are presented for resolution.
I. BACKGROUND
Jeffrey Koons, the plaintiff, is an internationally recognized American artist whose work has been described as "rooted in the pop-minimal-conceptual tradition.” In June 1991, in Budapest, Hungary, Koons married Ilona Staller, an Italian national who, under the stage name La Cicciolina, was a star of pornographic movies and books and sexually explicit shows. Her name and photograph are still used in connection with the advertising of pornographic pay-per-call telephone services, and she recently performed at a show in Ecuador, scantily clad and singing sexually explicit lyrics. In 1987 she was elected to serve as a member of the Italian Parliament.
Before the marriage in early 1991, Koons and Staller collab *844 orated on a series of sexually explicit photographs of the couple used by Koons to create sexually graphic works of art which were displayed in museums and galleries. Notwithstanding their mutual participation in creating such artwork, Koons states that as a condition to the June 1991 marriage Staller swore that "she would never again engage in pornography or participate in the commercial sex industry.”
Staller had difficulty obtaining a visa to enter the United States because of her professional activities, and the parties resided in Munich, Germany, during the first year of the marriage. Just prior to the birth of their son, Staller obtained a nonimmigrant visa (this type of visa is temporary and does not allow an alien to remain in the United States indefinitely). The parties’ son, Ludwig Maximilian Koons, was born in New York City on November 29, 1992. They live in Koons’ three-story 13-room townhouse on Manhattan’s East Side, and have travelled in the United States and to Europe.
The parties’ three-year marriage was tumultuous, marked by a pattern of marital disagreements and separations. On two occasions, in March 1992 and January 1993, Staller left their residence in Munich, Germany, and returned to her apartment in Rome, Italy. She states that her departure on those occasions was precipitated by arguments during which Koons physically or verbally abused her. Each time they subsequently reconciled.
In October 1993, Staller again left New York for Italy. Her departure was not surreptitious. She explains, "[rjenovation work was needed on my apartment there, and I hoped that perhaps, with distance, plaintiff and I could sort out our problems.” As she had done on one previous separation, she returned the keys to the apartment to Koons. After she left, Koons wrote and asked her to return to New York with Ludwig. She declined, explaining that the renovation work was proceeding slowly, and asked him to join them in Rome.
Koons states that in December 1993, he learned that Staller had left Rome to appear in Ecuador, South America, as La Cicciolina, and that Ludwig had been left in the care of a babysitter/housekeeper. Koons flew to Rome and when the housekeeper refused to allow him to leave Staller’s house with Ludwig, he called the Italian police. On December 22, 1993, an ex parte petition was filed by his Italian counsel with the Minor’s Tribunal of Rome, alleging that Ludwig had been left in the care of a "foreign girl.” That petition contained many *845 of the same allegations set out in the complaint in this proceeding, i.e., that Ludwig was exposed to pornographic objects and pictures, and that individuals who were part of the Italian pornography industry were frequent visitors to the apartment. It described Ludwig as being "in a condition of medical and moral abandonment” as a result of his mother’s actions. Koons requested temporary custody of Ludwig.
On December 23, 1993 the Minor’s Tribunal issued its decision. Finding no basis to grant Koons temporary custody because there was "no evidence of any immediate risk,” the Minor’s Tribunal ordered an investigation into the allegations. Koons was, however, granted visitation. The Minor’s Tribunal ordered that Ludwig’s passport not be used and enjoined Koons from taking him out of Rome.
After this decision, Koons went to Staller’s apartment and asked to take Ludwig to his hotel. Staller (who had by then returned from Argentina) called the police and was assured that the decree was in order. She allowed Koons to leave with Ludwig. Koons, using a duplicate passport for Ludwig, obtained by stating that the original was "lost,” took him to New York in clear violation of the decree issued by the Minor’s Tribunal.
Koons then immediately commenced this divorce action and moved for an order granting him temporary custody of Ludwig.
On January 24, 1994, Koons moved before the Minor’s Tribunal to dismiss the petition. Staller cross-moved for custody, alleging neglect. On March 25, 1994, the Minor’s Tribunal, noting the pendency of this action, divested itself of jurisdiction, stating that its competency to decide temporary custody issues terminated with the institution of an action for divorce or separation in the United States. Staller has filed an appeal from the order of the Minor’s Tribunal.
II. JURISDICTION
The question of whether this court may exercise jurisdiction over the issue of Ludwig’s custody is central to all the other issues, and must be decided at the outset.
Initially, I will examine Domestic Relations Law article 5-A, New York’s legislative enactment of the Uniform Child Custody Jurisdiction Act (UCCJA), adopted by every State. By setting forth criteria for jurisdiction, the Act attempted to end interstate conflict and competition over custody cases and the *846 acts of parental kidnápping that had become endemic to such disputes (see, Thompson v Thompson, 484 US 174 [1988]). Unfortunately, the UCCJA failed to achieve that result. In 1980, Congress enacted the Parental Kidnaping Prevention Act (PKPA) (28 USC § 1738A), which restates the jurisdictional provisions of the UCCJA and mandates the States to give full faith and credit to custody decrees of sister States. In the event of a conflict between the Federal and State statutes, the provisions of PKPA, pursuant to the Supremacy Clause of the Constitution, preempt those of the UCCJA (Matter of Michael P. v Diana G., 156 AD2d 59, 65 [1st Dept 1990]; Enslein v Enslein, 112 AD2d 973 [2d Dept 1985]; Farrell v Farrell, 133 AD2d 530 [4th Dept 1987]). In response to the problem of kidnapping on a global level, the Hague Convention on the Civil Aspects of International Child Abduction was adopted in 1980. The United States is a signatory. Italy became a signatory in January 1994 — too late for the Hague Convention to constitute controlling law in this instance.
Domestic Relations Law § 75-d defines the circumstances under which a court has jurisdiction to make custody determinations. Section 75-d (1) (a) (i) states that
"1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree only when:
"(a) this state (i) is the home state of the child at the time of commencement of the custody proceeding.”
Domestic Relations Law § 75-c (5) defines " 'Home state’ ” as "the state in which the child * * * has resided with * * * a parent * * * for at least six consecutive months.” As mentioned, Ludwig lived in the parties’ Manhattan townhouse between April 14, 1993 and October 11, 1993, the latter being the date on which Staller left for Italy with him. He returned to New York with Koons on December 23, 1993. The time span in which he was physically present in New York is slightly less than a full six-month period; however, the PKPA provides that "[p]eriods of temporary absence * * * are counted as part of the six-month period.” (28 USC § 1738A [b] [4].) Therefore, the fact that Ludwig was in Italy for approximately 11 weeks, prior to the commencement of the action, does not necessarily mean that the six-month requirement of Domestic Relations Law § 75-d (1) (a) (i) has not been met (see generally, Annotation, Significant Connection Jurisdiction of Court Under § 3 (a) (2) of the Uniform Child Custody Jurisdic *847 tian Act (UCCJA) and the Parental Kidnapping Prevention Act (PKPA), 28 USCS § 1738A (c) (2) (B), 5 ALRSth 550). The question is whether his departure from New York was intended to be permanent.
As previously stated, the relationship between the parties was marked by frequent separations, on an international scale. The correspondence during the most recent of these separations does not reflect any intent by Staller to permanently remain in Rome with Ludwig. To the contrary, they frequently speak of reconciliation. Furthermore, in papers before this court, Staller stated that her stay in Rome was "temporary,” albeit protracted by the repairs to the apartment. "I did not 'abandon’ the New York marital residence. At all times I made it clear that I intended to return, the only issue being precisely when.” Therefore, pursuant to Domestic Relations Law § 75-d (1) (a) (i), Ludwig should be viewed as having his primary residence in New York for the requisite six-month period. Accordingly, I hold that I have jurisdiction to decide this custody conflict.
Staller urges this court to divest itself of jurisdiction in view of both the prior Italian proceeding and Koons’ misconduct in violating the Italian decree, pursuant to Domestic Relations Law § 75-g (simultaneous proceedings in other States), Domestic Relations Law § 75-m (force and effect of custody decrees), Domestic Relations Law § 75-o (modification of a custody decree of another State), Domestic Relations Law § 75-i (jurisdiction declined because of conduct), and Domestic Relations Law § 75-h (inconvenient forum). Finally, Staller cites Domestic Relations Law § 75-w, which allows a court, in its discretion, to give comity to the custody decrees of courts of foreign countries under certain circumstances.
Notwithstanding the language of Domestic Relations Law § 75-w, which extends the general policies of the UCCJA to the international arena, the specific sections of the UCCJA (Domestic Relations Law art 5-A) do not apply in an international custody adjudication, because a foreign country is not a "State” within the meaning of the statute (see, Domestic Relations Law § 75-c [10]; Matter of Lotte U v Leo U., 128 Misc 2d 896 [Fam Ct, NY County 1985]; Klien v Klien, 141 Misc 2d 174 [Sup Ct, Kings County 1988]; Matter of Massey v Massey, 89 AD2d 566 [2d Dept 1982]; but see, L. H. v Youth Welfare Off., 150 Misc 2d 490 [Fam Ct, Suffolk County 1991]). Upon considering the cited provisions of Domestic Relations Law article 5-A, I decline to relinquish jurisdiction, both *848 because there is no basis in law to do so, and for public policy reasons.
Before a court will disturb a plaintiff’s choice of forum, a demonstration must be made that the forum selected is inappropriate (Banco Ambrosiano v Artoc Bank & Trust, 62 NY2d 65 [1984]). Ludwig has significant ties to New York: his pediatrician, his nanny (hired in 1993), the church he was baptized in and his budding social contacts are here, as are witnesses who can testify to his care, training and personal relationships. Staller has failed to identify the witnesses she claims would be inconvenienced by having to come into New York to testify. Additionally, given the international aspect of this relationship, Ludwig has spent a significant part of his life in New York. Most importantly, jurisdiction over the matrimonial action is here. These last two factors particularly militate against a foreign court’s interest in deciding the issue of custody (see, Marlow v Marlow, 122 Misc 2d 221 [Sup Ct, Nassau County 1993]).
Staller urges this court to decline to exercise jurisdiction on several grounds: that full force and effect should be given to "custody” decrees (Domestic Relations Law § 75-m), that the court should not modify the custody decrees of other States (Domestic Relations Law § 75-o), and that the decree of the Minor’s Tribunal should be afforded comity (Domestic Relations Law § 75-w). However, the application of these Domestic Relations Law sections is not available or appropriate in this case.
To the extent the jurisdiction invoked by the parties in Rome was the authority of the Minor’s Tribunal to hear neglect allegations, Domestic Relations Law § 75-c (3) is a bar to the recognition of that order, since under section 75-c (3) neglect proceedings are specifically excluded from the definition of custody hearing to which the previous sections apply.
To the extent the Minor’s Tribunal had jurisdiction to hear the case as a custody matter involving an intact family, that jurisdiction dissolved upon the commencement of this divorce action. Indeed, the Minor’s Tribunal divested itself of jurisdiction when it learned of the instant matrimonial action, thus mooting defendant’s claim of a simultaneous proceeding to which this court should defer.
Finally, whatever the merits of Staller’s claim to relief under Domestic Relations Law § 75-i, i.e., that jurisdiction should be declined because of Koons’s conduct, at this june *849 turc it would not be in the best interests of the child to do so. For the same reason, the court declines to delay this matter notwithstanding Staller’s appeal of the dismissal of the matter before the Minor’s Tribunal (which appeal, under Italian law, acts as an automatic stay). This State is Ludwig’s home State and he has substantial contacts here. The determination of pendente lite custody has already been protracted and it is vital to Ludwig that matters be decided quickly (see, Matter of Murray-Lee v Lewis, 136 AD2d 517 [1st Dept 1988]; see also, Matter of Nehra v Uhlar, 43 NY2d 242, 250 [1977]). Therefore, defendant’s cross motion for dismissal of the custody claim before this court is denied.
in. counsel’s presence at forensic examination
The request that counsel be permitted to attend Staller’s sessions with the forensic psychiatrist is granted.
While the general issue of permitting counsel to be present during court-ordered forensic examinations has been previously addressed in various other settings, this precise issue, in a custody setting, has never been addressed directly in New York; nor does it appear that this exact issue has been considered in any other jurisdiction. Consequently, I must examine similar settings where the issue of a party’s right to have counsel present at a court-ordered psychiatric examination has been considered.
It is settled law in this Department that in proceedings to terminate parental rights, a party may choose to have counsel present during the court-ordered forensic examination. The Court of Appeals, in Matter of Alexander L. (60 NY2d 329, 330 [1983]), held that "a parent who is to be examined by a court-appointed psychiatrist in a proceeding to terminate the parental relationship * * * is entitled to have [his or her attorney] present during the examination if the parent so desires, in the absence of a demonstration as to how such presence would impair the validity and effectiveness of the particular examination.” The Court of Appeals reasoned that the psychiatric examination in the termination of parental rights setting is a critical phase of the litigation, and as was expressed in United States v Wade (388 US 218 [1967]), a party to a civil action is entitled to have counsel present at all critical stages of a proceeding, whenever it is necessary to preserve the party’s right to a fair trial and the right to a meaningful cross-examination.
*850 On remand of Matter of Alexander L. (112 AD2d 902 [1st Dept 1985]), the Court reiterated the right of counsel at a forensic examination in proceedings for termination of parental rights, and went on to add that not only is the parent who might lose parental rights entitled to have an attorney present at the psychiatric examination, but all other parties in the matter may also have counsel present, so that no party has an unfair advantage.
In a divorce action where a forensic examination was ordered on the issue of the wife’s claimed disability, the Second Department remarked that counsel for the party being examined may be present during the examination conducted by the court-appointed forensic psychiatrist. In Nalbandian v Nalbandian (117 AD2d 657 [2d Dept 1986]), Mrs. Nalbandian sought an award of maintenance because she claimed that she suffered from a psychological disorder which prevented her from working. It was held that by making this claim, Mrs. Nalbandian placed her mental condition in question and as a result, the Court ordered a psychological examination. Although the Court held that adverse counsel may not be present during the examination, it explicitly allowed the parties’ own counsel to be present while their clients were examined. The Nalbandian Court did not make specific mention of the critical phase theory enunciated in Matter of Alexander L. (supra); however, the Court clearly considered the forensic examination to be of sufficient importance in the maintenance proceeding to entitle counsel to be present to protect the client’s rights.
While a claim for spousal maintenance is an integral part of a divorce action, a claim for custody is much more critical. "[A natural] parent’s desire for and right to 'the companionship, care, custody, and management of his or her children’ ” is an interest far more precious than any property right (Lassiter v Department of Social Servs., 452 US 18, 27 [1991], quoting Stanley v Illinois, 405 US 645, 651 [1972]). It is undoubtedly for that reason that the right to counsel for indigent parties has been extended to custody proceedings (see, Family Ct Act § 262 [a] [iv]; Matter of Ella B., 30 NY2d 352 [1972]). Since a custody proceeding is of greater import than a maintenance proceeding, it seems clear that, absent a direct holding in this Department to the contrary, Nalbandian (supra) requires that counsel be permitted to attend and observe the client’s sessions with the forensic psychiatrist.
Furthermore, two recent Appellate Division decisions, Mat *851 ter of Renee B. v Michael B. (204 AD2d 57) and Rentschler v Rentschler (204 AD2d 60), have demonstrated that a court-ordered psychiatric examination is, in fact, a critical stage of a custody proceeding, perhaps the most critical part. In both cases, the Appellate Division suggested that the independent findings of the court-appointed forensic psychiatrist should be given even greater weight than the findings and opinion of the Trial Judge.
In view of these recent holdings, it is clear that the court-ordered forensic examination is a vital phase in a custody proceeding, perhaps the most critical stage. So, in accordance with the reasoning set forth in Nalbandian and Matter of Alexander L. (supra), a party’s own counsel should certainly be permitted to be present during the court-ordered forensic examination in a custody proceeding if the client requests the attorney’s presence to ensure his rights are not abridged during this crucial stage of the proceeding.
The examining psychiatrist in this case has indicated his preference that counsel not be present during his examination because he believes that such presence would be disruptive and might change what the litigants intend to say to the doctor. However, particularly in light of the primacy of expert’s evaluations as expressed in Renee B. (supra) and Rentschler (supra), the doctor’s preference alone is not sufficient grounds to exclude counsel (see, Matter of Tanise B., 119 Misc 2d 30 [Fam Ct, Bronx County 1983] [although the examining doctor stated that the presence of counsel could disrupt or distort the subtle but important behaviors observed during a doctor-patient interaction and it would be more difficult to assess the patient’s behavior accurately, counsel was still permitted to be present because in such cases the psychiatric examination is a critical phase in the litigation]).
I am also cognizant that the guardian ad litem seeks to bar counsel from attending the clients’ sessions with the forensic psychiatrists and draws a parallel between this case and the situation in a juvenile delinquent dispositional hearing. In Matter of Steven E. H. (124 Misc 2d 385 [Fam Ct, Kings County 1984]), counsel was not permitted to be present during the psychiatric examination, with the reasoning that the forensic examination is not the most important factor considered in the case, but only one of the many factors considered. At the dispositional phase, "the court is required to consider, in addition to the psychological reports, the probation reports *852 * * * history of prior conduct, the family situation, reports from other agencies and persons, and all other evidence and testimony of witnesses presented at the dispositional hearing” (supra, at 390). However, the reasoning of Steven E. H. is inapposite, particularly in light of the recent decisions in Renee B. (supra) and Rentschler (supra).
Here, the court-ordered forensic evaluation will be the . primary evidence supporting a custody determination. As a result, counsel for the party being examined must be permitted to be present.
[Portions of opinion omitted for purposes of publication.]