938 S.W.2d 910 (1997)
In re S.M. and A.M., Respondents,
T.H. and S.P., Respondents,
v.
A.S., Appellant.
No. WD 50666.
Missouri Court of Appeals, Western District.
January 7, 1997.
Motion for Rehearing and/or Transfer Denied March 4, 1997.
*912 Michael S. Ketchmark, Larson & Larson, Kansas City, for appellant.
Kim S. Summers, Dysart Taylor Penner Lay & Lewandowski, Kansas City, for Guardian Ad Litem.
James A. Durbin, Swanson Midgley Gangwere, Kitchin & McLarney, Kansas City, for respondents T.H. and S.P.
Before EDWIN H. SMITH, P.J., BRECKENRIDGE and ELLIS, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied March 4, 1997.
*913 BRECKENRIDGE, Judge.
Joela and Frank are orphaned refugees from the African nation of Burundi.[1] They immigrated to the United States in 1991 with an aunt and a cousin, and lived with those relatives as a family until the aunt's death. After the aunt's death, two competing petitions were filed requesting appointment as guardians and conservators of the children. One was filed by the children's Rwandan uncle, Abel. The other was filed by an unrelated American couple, Tom and Sally, who had befriended the family. The trial court sustained the petition of the American couple and appointed them co-guardians and co-conservators of the children. Abel appeals.
The first issue raised by Abel is whether Missouri has jurisdiction of this proceeding. Abel claims that Missouri was not the children's "home state" under the Uniform Child Custody Jurisdiction Act, § 452.440-452.550, RSMo 1994,[2] because the children stayed in Kansas with Tom and Sally during the times their aunt was out of the country and in the hospital. As the children's time in Kansas was only a temporary absence from the state, Missouri was the home state of the children and the court had jurisdiction.
On the merits, the primary issue is whether the trial court misapplied the law or entered a judgment against the weight of the evidence when it granted guardianship and conservatorship of Joela and Frank to the American couple who are also guardians of the children's cousin, rather than to the children's Rwandan uncle and his wife, who currently live as refugees in Stockholm, Sweden. The children's closest interpersonal bond was with their cousin, rather than their uncle, and, contrary to his claim, the uncle did not prove he was entitled to be appointed guardian because he was already the children's guardian under Burundi law. Therefore, the court did not misapply the law or rule against the weight of the evidence when it appointed guardians who would provide a home where the children could continue to live with their cousin. Accordingly, the judgment of the trial court is affirmed.
On appeal, this court is compelled to consider the evidence and any reasonable inferences therefrom in the light most favorable to the trial court's judgment, and to disregard any evidence to the contrary. Matter of Mitchell, 914 S.W.2d 844, 847 (Mo. App.1996).
This case involves the guardianship of two siblings, Frank, a male minor, and Joela, a female minor. The record pertaining to the children's ages is contradictory, but it appears that Frank was ten to eleven years old at the time of trial, and in the sixth grade. Joela was seven to nine years old at that time, and in the third grade.
An examination of Frank and Joela's family history is essential to meaningful review of the trial court's judgment. The children's mother was Rwandan. Mother had a number of siblings and half-siblings because her father had several wives, as was common in the Rwandan culture. The siblings relevant to this guardianship proceeding are Abel and Emmanuel, her full brothers, and Rose, her half-sister. Mother, Abel, Emmanuel and Rose were members of the Tutsi tribe. When political unrest broke out in Rwanda, the wives and their respective children separated. Some family members stayed in Rwanda, while others went to Burundi, Kenya and Uganda.
Mother took refuge in Burundi, where she married and the children were born. Little is known of the children's father, other than he was part Hutu, another African tribe, and that he was deceased at the time of trial. When the children were born and for some time thereafter, Mother and her brother, Abel, lived in the same household. When the civil war in Rwanda spread into Burundi, it became unsafe for members of the Tutsi tribe because they were in the oppressed minority. Abel was advised that he might be able to immigrate to Canada, so he left Burundi in 1989 and went to Nairobi, Kenya to *914 pursue immigration opportunities. While in Kenya, he stayed for two weeks with his half-sister, Rose, and then found a place nearby to live.
The children's mother died in 1990, and the children were brought to Rose's home in Kenya by their uncle, Emmanuel. There the children lived with Rose and her daughter, Lucy. While Abel was awaiting authorization to immigrate to Canada, he was arrested, along with other Rwandan refugees, and given three weeks to leave Kenya. Abel found refuge in Sweden, so he left Kenya to go to Sweden on January 27, 1991. He took with him two of Rose's children, Christopher and Amos, who had been living in Uganda.
Before Abel left, Rose was diagnosed as HIV positive. She decided to immigrate to the United States where treatment was available. Rose made contact with a man who had an immigration dossier which would allow a family to go to the United States. He and his children were looking for five others who would fit the profile of the family. Rose, Frank, Joela, Lucy and Claude, a younger brother of Abel and Emmanuel, assumed the identities of the family in the dossier to gain entry into the United States. After arriving in this country, Rose, Frank, Joela, Lucy and Claude, took up residence in a house in midtown Kansas City, Missouri.[3]
While Rose and the children lived in Kansas City, Abel lived in Stockholm, Sweden with Christopher and Amos. After about three years, he married Judy, a woman he had known in Burundi. Judy is an Australian citizen, but she was born and raised in Africa where her parents were missionaries. Because of her African experience, Judy has a good understanding of Rwandan culture. At the time of their marriage, Abel and Judy had a five-month-old son, Michael. Abel, Judy, Michael, and Rose's sons, Christopher and Amos, have lived together in Stockholm since the marriage.
There was very limited contact between Frank and Joela and Abel during most of the time the children lived with Rose in the United States and Abel lived in Sweden. When Abel called or wrote, his communications were normally with Rose. He seldom communicated with Frank and Joela other than to ask Rose to tell the children "hello."
While living in Kansas City, Rose, Lucy, Frank, Joela and Claude had difficulty meeting their basic needs such as food and were forced to live in a shelter at one point. At another time, during one of Rose's hospitalizations, the children were placed in foster care. Although Rose had contact with Abel throughout this period, Abel did not provide assistance.
Rose and the children did receive aid from a married couple residing in Kansas City, Kansas. The husband, Tom, was a Peace Corps volunteer in Africa from 1985 to 1987. After returning to the United States, he attended law school and began practicing law in the Kansas City area in 1991. His wife, Sally, was working on a master's degree in psychology and was a research associate at the University of Kansas Medical Center, studying persons with cancer and how they and their relatives coped.
In the fall of 1991, Lucy telephoned Tom at his law office and told him that she and her family had moved to Kansas City from Africa as refugees, and that they were interested in meeting him because of his background as a Peace Corps volunteer in Zaire. Lucy arranged a meeting of Tom and Sally with Rose. At this first visit, Tom and Sally learned that Rose had contracted the HIV virus. Almost immediately, Tom and Sally became friends with Rose and the members of Rose's household, and began having regular contact with the children. Tom visited the family once every couple of weeks, and Sally saw them at least once a week. Sally provided transportation for Rose, and Tom and Sally frequently brought food to the family.
Sometime in the second half of 1993, when Abel was pressing Rose for custody of Frank and Joela, Rose decided she did not want Abel to contact the children directly. She would not give him their phone number. Emmanuel, who was in Kansas City at the time, suggested to Abel that he should try to *915 reach the children at school. Abel began calling the children at school.
In early March of 1994, Rose traveled to Sweden to visit her sons who were living with Abel, and to Germany to visit another son living with her sister, Esther. Frank, Joela, and Lucy stayed with Tom and Sally during her absence. Rose returned approximately four weeks later, but she became ill shortly thereafter and was admitted to a hospital. Rose called Sally and asked that Sally and Tom again take care of the three children. After Rose returned to the United States, she continued to limit Abel's contact with the children. She would not give him the telephone number where the children could be reached.
On April 19, 1994, while in the hospital, Rose executed a will which addressed the guardianship of Frank, Joela, and Lucy in the event of her death.[4] The will named Rose's brother, Marara, who lived in Burundi, as their guardian, but alternatively named Tom and Sally to serve as guardians if Rose's brother was unable to fulfill that responsibility.[5] Rose stated in her will that she did not believe Emmanuel was fit to care for the children.
In late April, Emmanuel came to Kansas City and demanded that Rose give him Joela and Frank. He did not seek custody of Lucy. Tom and Sally met with Emmanuel while he was in the area. Tom advised Emmanuel that the custody of the children would be determined by someone other than Tom and Sally. Since they currently had custody of the children, however, Tom told Emmanuel that they were entitled to know information about him like his employment, lifestyle, and what it would be like for the children if they lived with him. Emmanuel became angry in response to these inquiries and told them that it was none of their business. Tom also questioned whether Emmanuel had the legal ability to take the children to Canada, based on a letter Rose had shown him from a Canadian attorney. Emmanuel threatened to contact the United States Immigration Service and have the whole family deported to Africa. Rose and Emmanuel argued frequently over these issues, because Rose was not willing to let Emmanuel or Abel take the children. Rose thought that Emmanuel wanted the children so that he would be eligible to receive government benefits.
During the last week of May, Rose called Abel, and Tom spoke to Abel for the first time. Abel thanked Tom for caring for the children and indicated that the children should be given to Abel or his brother, Emmanuel. Tom expressed opposition to the placement of the children with Emmanuel, because he did not think Emmanuel was capable of caring for the children. He also told Abel that he was not going to put the children on a plane to Sweden without knowing anything about the person who would be there to receive them. He advised Abel that Abel would have to come to the United States and present himself to a court and prove that he was a suitable guardian. Abel asked Tom for the children's phone number so he could contact them. Tom refused to give it to him because when Abel had previously called the children at school, his calls agitated and upset Frank.
Rose's health continued to decline, and she died on June 6 or 8, 1994. On June 15, 1994, Tom and Sally filed a petition with the Probate Division of the Jackson County Circuit Court to be appointed as joint guardians and conservators for Lucy, Frank and Joela. Thereafter, Abel and his wife filed a competing petition to be appointed as joint guardians and conservators for Frank and Joela.
Tom and Sally's petition for appointment as guardian and conservator of Lucy was not contested. On September 30, 1994, the Probate Division appointed Tom and Sally to be co-guardians and co-conservators for Lucy. *916 The Probate Division then transferred the matter of the contested guardianship and conservatorship of Frank and Joela to the Family Court Division of the Jackson County Circuit Court for adjudication. The matter was tried on November 17, 18, and 23, 1994 in the Family Court.
At trial, Tom and Sally, as well as other witnesses who testified on their behalf, offered the following evidence about the children's relationship with Lucy. The children and Lucy had lived together as a family for five years. They had a very loving relationship, like that of siblings. Lucy talked to Frank and Joela about their culture and their family. She and Frank enjoyed sharing African music. Lucy and the children frequently spoke Swahili to each other.
There was also ample testimony that the children were loved and well cared for by Tom and Sally, and that the children were thriving in their new environment. Tom and Sally were actively involved in the children's education. Joela was described as straight A, or near straight A, student. Frank's teacher noted a dramatic improvement in his school performance after he began to live with Tom and Sally. Both children were student council representatives in their schools. Tom testified that he and Sally recognized the importance of the children's retention of their cultural identity, and were making efforts to bring the children's attention to it.
Abel also testified at trial, and stated that he was a Rwandan refugee who was now a permanent resident of Sweden. He stated that he lived with his wife, son, and Rose's two sons in a three-bedroom residence in Stockholm. He was not employed at the time of trial, but was attending school and assimilating Swedish culture as a prerequisite to finding employment in that country. In addition, as a refugee, he received financial support from the Swedish government which he said was sufficient to take care of Frank and Joela's needs should he be awarded their custody.
Following trial, the trial court entered a judgment granting Tom's and Sally's petition to be appointed joint guardians and conservators, and denying the competing petition filed by Abel and his wife. Later, a motion for rehearing was denied by the trial court. Abel appeals the judgment.
On appeal, Abel contends (1) that the judgment is void because the trial court lacked jurisdiction under the Uniform Child Custody Jurisdiction Act, §§ 452.440-452.550; (2) that the trial court erred by denying his petition because he had already obtained the status of legal guardian under African law and tribal custom; (3) that the trial court failed to properly apply a presumption favoring relatives in the appointment of guardians; (4) that the judgment of the trial court is against the weight of the evidence; (5) that the trial court failed to elicit the preferences of the children in appointing their guardians and conservators; and (6) that the trial court's judgment was erroneous because their guardian ad litem failed to exercise her statutory duty to represent the best interests of the children.
In his first point on appeal, Abel claims that the judgment is void because the trial court lacked jurisdiction to adjudicate this case under the Uniform Child Custody Jurisdiction Act (UCCJA), §§ 452.440-452.550.[6] Abel contends that jurisdiction properly lies in Kansas because Kansas, not Missouri, is the children's home state, and because only Kansas has a significant connection with the children.
Abel's challenge to the jurisdiction of the trial court is made for the first time on appeal. In fact, Abel and Judy alleged in their petition for guardianship and conservatorship that the children were domiciled in Jackson County, Missouri. Nevertheless, this court has a obligation to determine jurisdiction, sua sponte, so we will review the trial court's jurisdiction under the Uniform Child Custody Jurisdiction Act. Rouse Co. of Mo. *917 v. Justin's, Inc., 883 S.W.2d 525, 528 (Mo. App.1994).
The Act provides in § 452.450, that a Missouri court has jurisdiction to make child custody determinations if one of four possible jurisdictional bases exist. These four grounds are commonly referred to as (1) home state, (2) significant connection, (3) emergency, and (4) default or vacuum. State ex rel. Rashid v. Drumm, 824 S.W.2d 497, 501 (Mo.App.1992). The term "home state" is defined as:
the state in which, immediately preceding the filing of custody proceeding, the child lived with his parents, a parent, an institution; or a person acting as parent, for a [sic] least six consecutive months; or, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period [.]
Section 452.445(4) (emphasis added).
The "home state" basis provides that a Missouri court has jurisdiction if Missouri:
(a) Is the home state of the child at the time of commencement of the proceeding; or
(b) Had been the child's home state within six months before commencement of the proceeding and the child is absent from this state for any reason, and a parent or person acting as parent continues to live in this state[.]
Sections 452.450.1(1)(a) and (b). Clearly, Missouri is not the children's home state for the purposes of the latter of these two provisions, § 452.450.1(1)(b), because there was not a parent or a person acting as parent who continued to live in Missouri at the time of the commencement of the guardianship proceedings. It is Abel's contention on appeal that Missouri was also not the home state for the purposes of § 452.450.1(1)(a), because the children had moved from Missouri to Kansas three months prior to the filing of the guardianship petition. Tom and Sally, on the other hand, contend that Missouri is the home state for the purposes of § 452.450.1(1)(a) because the children's presence in Kansas qualified as a temporary absence under § 452.445(4).
The UCCJA does not provide any statutory definition of a "temporary absence" for the purposes of § 452.445(4). A review of Missouri case law reveals that no rule has been articulated to govern when a removal from the state constitutes a temporary absence, but the cases appear to be decided based upon the circumstances of each case. In State ex rel. Wilson v. Brown, 897 S.W.2d 171 (Mo.App.1995), the children at issue lived with their parents in Missouri from birth until their mother took them to Texas on April 16, 1994. Then, at some point between June 1, 1994 and August 1, 1994, the mother returned the children to Missouri. On October 20, 1994, the father filed suit for dissolution of marriage and for custody of the children. On the same day, the mother filed a similar suit in Texas. The Southern District concluded that Missouri had jurisdiction as the home state under both § 452.450.1(1)(a) and (b). With respect to § 452.450.1(1)(a), the court found that the one-and-a-half to three-and-a-half month absence in 1994 was a temporary absence within the meaning of § 452.445(4). 897 S.W.2d at 175.
Conversely, in Timmings v. Timmings, 628 S.W.2d 724, 725 (Mo.App.1982), the child at issue lived in Missouri from birth until December 23, 1976, when the mother moved to Iowa and took the child with her. The mother was custodian of the child under the parties' decree of dissolution, dated September 26, 1976. The mother moved without telling the father where she was going, and she concealed the child's whereabouts for the next three years. About one month after wife left Missouri, the father, who was then a resident of Illinois, filed a motion to modify the parties' decree of dissolution, seeking custody of the child. The Eastern District concluded that Missouri was not the child's home state pursuant to § 452.450.1(1)(a), observing in a footnote that "[i]t would strain logic to call the final month a `temporary absence.'" Id. at 726 n. 5.[7]
*918 In other jurisdictions, one court has focused on the length of the absence in determining if the absence was temporary, In re Marriage of Schoeffel, 268 Ill.App.3d 839, 206 Ill.Dec. 59, 61, 644 N.E.2d 827, 829 (1994); while other courts have focused on whether the parties intended the absence to be temporary or permanent. Walt v. Walt, 574 So.2d 205, 216 (Fla.App.1991); Koons v. Koons, 161 Misc.2d 842, 615 N.Y.S.2d 563, 567 (Sup.1994). Still other courts don't refer specifically to the length of the absence or the intent of the parties, but look to the totality of the circumstances. Jones v. Jones, 456 So.2d 1109, 1113 (Ala.App.1984); In re Marriage of Richardson, 255 Ill.App.3d 1099, 193 Ill.Dec. 1, 3-4, 625 N.E.2d 1122, 1124-25 (1993); Joselit v. Joselit, 375 Pa.Super. 203, 544 A.2d 59, 63 (1988). In comparing the different approaches to resolving the temporary absence issue, the totality of the circumstances test is best suited to adequately deal with the variety of situations which occur, is consistent with prior Missouri decisions, and will be adopted by this court.
Reviewing the totality of the circumstances, here, it is clear from the record that the three months which the children spent in Kansas prior to the commencement of the proceedings was a temporary absence for the purposes of § 452.445(4). First, this amount of time was comparable to the period of three-and-a-half months which was determined to be a temporary absence in State ex rel. Wilson. Secondly, when the children went to Kansas to stay with Tom and Sally, it was with the intention that the arrangement be temporary while Rose traveled to Europe and then when she entered the hospital for treatment. The children received public assistance from the state of Missouri as Missouri residents, while they stayed with Tom and Sally. And, they continued to attend school in Missouri. These facts distinguish this case from Timmings, where it was clear from the facts that the absence of the child was not temporary.
Because Missouri was the home state of the children at the time of the commencement of the proceedings, the trial court had jurisdiction to appoint Tom and Sally as the children's joint guardians and conservators. Nevertheless, Abel argues that the trial court's judgment is a nullity because the trial court failed to make explicit findings as to its own jurisdiction in this case.
In support of his argument, Abel cites Piedimonte v. Nissen, 817 S.W.2d 260, 266 (Mo.App.1991), which states that "[i]t is implicit in the scheme of the UCCJA that the court make an initial determination of jurisdiction by express findings of fact before proceeding to the substantive issue of custody," and that a trial court's failure to make such express findings "does not meet the objectives" of the UCCJA. But Piedimonte does not hold that a trial court's failure to make such findings renders its decision a nullity. On the contrary, in Piedimonte, the appellate court proceeded to review the record for evidence of jurisdiction despite the absence of findings by the trial court. Id. at 266-73. This court has done the same. Point denied.
In his second point on appeal, Abel claims that the trial court erred by failing to acknowledge that, pursuant to African law and custom, he was already Frank's and Joela's legal guardian. Abel contends that the trial court exceeded its authority by appointing Tom and Sally as guardians for the children without first terminating Abel's pre-existing status as their guardian. In the alternative, Abel asks that this case be remanded for a full hearing on his claim to be the children's guardian under African law and custom.
Although unaddressed by Abel in his brief, the legal basis for recognizing the law of another country is the doctrine of comity. See Manor v. Manor, 811 S.W.2d 497, 498 (Mo.App.1991). In contrast to the full faith *919 and credit clause of the federal constitution, which imposes obligations on the courts of a sister state, the doctrine of comity is a rule of voluntary consent; it has been defined as a courtesy or a willingness to grant a privilege, not as a matter of right but out of deference, respect, and good will. State ex rel. Dykhouse v. Edwards, 908 S.W.2d 686, 689 (Mo. banc 1995).
The full faith and credit clause of the United States Constitution has no application in this case because of the obvious fact that Burundi is not a sister state of the state of Missouri. See In re Marriage of DeLeon, 804 S.W.2d 801, 803 (Mo.App.1991). Although international agreements or treaties may be a basis for granting full faith and credit to the laws and judicial decisions of other countries, Abel fails to argue or present any authority that the guardianship laws of Burundi are entitled to full faith and credit by the courts of the state of Missouri. In fact, Missouri has not adopted § 23 of UCCJA which "extends the general policies of the act to the international area and provides for recognition and enforcement of custody decrees of other nations under certain circumstances.... The failure of a state legislature to adopt § 23 has been held to express an intent not to require the enforcement of foreign custody decrees." State ex rel. Rashid, 824 S.W.2d at 500-01. Therefore, the only avenue for recognition of the African law and custom is through a gratuitous application of the doctrine of comity. DeLeon, 804 S.W.2d at 803.
Although the doctrine of comity may establish a general principle allowing for the recognition of the laws and judicial decisions of a foreign country, to apply the doctrine, the court must have the law of the foreign country properly before it. Abel has not given this court a sufficient basis for considering African law. First, Abel made no offer of African law to the trial court. There is one instance in the record where Abel attempted to introduce testimony of how the Burundi tribes determine custody of a child when a family member dies. On direct examination, Abel's trial counsel was questioning a witness who had been a close family friend of Rose, when the following exchange occurred:
Q. And when a family member dies Andat least inin your tribe and the Burundi tribes, when a family member dies, how are thingshow is custody of the children decided?
A. It is decided by
The guardian ad litem then made an objection on the basis of relevance, which the court sustained. After the trial court sustained the objection, Abel failed to make an offer of proof setting out the excluded testimony. Because no offer of proof was made, any error in the exclusion of evidence was not preserved for appellate review. Dunkin v. Reagon, 710 S.W.2d 498, 499-500 (Mo.App. 1986).
In addition, the question to the witness does not appear to be an effort to present a proper foundation for the introduction of Burundese law. The question may have been an attempt to inquire as to the lay witness' knowledge of the African tribal custom concerning guardianship. But, there is no authority that any evidence of "custom" would be entitled to recognition under the doctrine of comity. See Black's Law Dictionary 267 (6th ed.1990) (defining "comity of nations" as the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation ...") (emphasis added).
In his brief on appeal, Abel presents for the first time what he alleges to be a translation of a section of the Rwandese and Burundese Guardianship Codes which, according to Abel, establish his status as the children's legal guardian. There is no indication that Abel ever presented these sections of the Rwandese and Burundese Guardianship Codes to the trial court for consideration as evidence. Consequently, this court may not address the issue of the Codes on appeal. Miller v. Pool and Canfield, Inc., 800 S.W.2d 120, 124 (Mo.App.1990).
Nevertheless, Abel sought this court's leave to file a supplemental record on appeal which included the pertinent section of the Rwandese and Burundese Guardianship Code. In his motion, which was denied, *920 Abel asked this court to take judicial notice of the African law. This court cannot take judicial notice of the law of a foreign country. Lane v. St. Louis Trust Co., 356 Mo. 76, 201 S.W.2d 288, 291 (1947).
Abel further asks that the case be remanded to the trial court so he could present the proper evidence to support his claim that he is the children's guardian under Burundese law. He cites no authority for his position that an appellant can be given a new trial simply because the appellant desires to offer evidence at a retrial which the appellant could have, but failed to offer in the first trial. Abel's allegation most closely resembles a request for a new trial on the grounds of newly discovered evidence; however, he does not fall within its parameters since the evidence was known to him before trial. See Higgins v. Star Elec., Inc., 908 S.W.2d 897, 903 (Mo.App.1995).
Because Abel has failed to preserve this issue for appellate review, and because Abel cannot obtain judicial notice of the alleged Code provision on appeal, his second point is denied.
In his third point on appeal, Abel claims that the trial court erred by ignoring a common law preference for relatives in choosing a minor's custodian. Abel contends that this preference creates a rebuttable presumption in favor of the relative which can only be overcome by evidence that the relative is incapable of serving as custodian. Abel argues that since there was no such evidence here, the trial court erred in naming Tom and Sally as joint guardians and conservators for the children.
Abel is correct that there is a limited preference for near relatives in the appointment of a guardian for a minor, based on the belief that a guardian will more zealously protect the interest of a relative than the interest of a stranger. In re Brinckwirth's Estate, 268 Mo. 86, 186 S.W. 1048, 1052 (1916). However, Abel misstates the extent of this preference when he claims that the preference can only be overcome by evidence that the relative is incapable of serving as custodian. More accurately stated, the law in Missouri is that, in the case of a guardianship of a minor, there is a preference to be given a relative over a stranger when all other things are equal. Id.; In Interest of J.L.H., 647 S.W.2d 852, 859-60 (Mo.App.1983).
This case is similar to J.L.H., 647 S.W.2d at 860, where the trial court determined that, even though the grandmother and the unrelated couple seeking custody were both well-intentioned and well-qualified, the totality of the circumstances favored the unrelated couple's home to better serve the interests of the child. Some of the factors weighing in favor of the nonrelatives were that the child did not speak the same language as the grandmother and the placement in the grandmother's home would result in the child's separation by a great distance from his half brothers and sisters. Id. at 855-599. Because more factors weighed in favor of the nonrelatives' home, the grandmother did not receive the relative's preference. Id. at 860. In other words, only when the competing homes are truly equal does the relative preference tip the scale. Id. at 859-60.
Here, the trial court decided that the scales were not evenly balanced, and the preference for relatives was not needed to "tip the scales." As noted in our disposition of the next point on appeal, the most important factors in a child custody determination are a good environment and a stable home. Id. at 859. There was sufficient evidence for the trial court to conclude that these considerations were better served by having the children remain in a home where they were established and their relationship with Lucy would continue. This court is unable to conclude that this decision was erroneous. Point denied.
In his fourth point on appeal, Abel claims that the trial court's decision was against the weight of the evidence, particularly in light of the trial court's findings that Abel was financially and emotionally capable of providing for the children, and that Abel could help the children maintain their cultural identity. Abel further argues that the primary reason that his own petition was denied was the trial court's belief that it would lose jurisdiction to enforce visitation if the children moved to *921 Sweden. Abel contends that this is an insufficient reason to overcome the findings which favored him.
Review of this court-tried case is under Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). The judgment is affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence or the trial court erroneously declared or applied the law. Estate of Williams, 922 S.W.2d 422, 423 (Mo.App. 1996). This court will reverse a custody determination on the ground that it is against the weight of the evidence only if there is a firm belief that the judgment is wrong. Murphy v. Carron, 536 S.W.2d at 32. In reviewing the evidence, the appellate court gives deference to the trial court's determination of the credibility of witnesses, because "[t]he trial judge is in a better position than this court to determine the credibility of the parties, their sincerity, character and other trial intangibles which may not be shown by the record." Williams, 922 S.W.2d at 423 (quoting Kelley v. Prock, 825 S.W.2d 896, 897 (Mo.App.1992)).
Abel relies upon evidence of his relationship with the children prior to 1989, when he lived with the children and their mother in Burundi. He also stresses his incessant desire to be reunited with them after they immigrated to the United States. The reality is, however, that Abel ceased living with the children in 1989, and he has not been a prominent figure in their lives since his move to Sweden in 1991, though through no fault of his own.
In contrast, for the last five years the children have lived in the same home with their cousin, Lucy. Since Frank was five or six and Joela was three or four, Lucy has been like a sister to them. Abel has never suggested that Lucy come to Sweden to live with him and Judy, and Lucy desires to remain in the United States. Lucy's guardians and conservators are Tom and Sally, and she will continue to live in their home until adulthood.
If the children were placed with Abel, the move to Sweden would totally disrupt the children's relationship with Lucy. In addition, they would be moving to a foreign country where they do not speak the language, to live with five persons with whom they have had almost no contact for the last four years. The trial court's decision was also made in light of the fact that the children have already suffered the loss of a mother and a surrogate mother.
The dilemma faced by the trial court was not whether the children should live with an unrelated American couple or an African uncle. Instead the trial court had to decide whether the best interests of the children would be served by appointing guardians who would maintain the sibling-like relationship of the children with their cousin in a caring, stable environment or by appointing guardians who would raise the children with a greater appreciation and understanding of their heritage, but who will take them to Sweden, separating them from the person with whom they have their closest interpersonal bond.
Abel's claim that the trial court ruled in favor of Tom and Sally primarily out of a concern that the court would lose jurisdiction to enforce visitation if the children moved to Sweden is not persuasive. There was nothing inappropriate in the court's consideration of this factor, and the trial court's findings do not suggest that this was the critical factor which "tipped the scales" in favor of Tom and Sally. There was no indication that the trial court relied more upon this factor than upon the other factors cited in the findings as favoring the trial court's decision. These other factors included Frank's and Joela's close relationship with Lucy and the fact that she will remain in the United States and reside in Tom and Sally's home until adulthood; that Lucy can speak an African language with the children and maintains an interest in African culture; Tom's and Sally's ability to provide for the children; the children's close relationship to Tom and Sally and their extended family members; and the fact that the children were well-adjusted and doing well at school.
Abel may be correct that the trial court's decision reveals a clash of cultural values. He suggests to this court that Rwandans place the highest value upon children being *922 raised by the closest blood relative who can educate the children as to their tribal heritage and culture. Although Missouri courts recognize that placement with a relative benefits the children, the law of Missouri places a higher value on the quality of the children's home environment and the stability of the home and relationships. See J.L.H., 647 S.W.2d at 859.
In reaching its decision as to the best interests of the children, the trial court did not ignore the value of the children learning their heritage and culture. The court considered the children's opportunities to be exposed to their tribal culture and customs under their present circumstances, and found that Lucy, who is one-half Tutsi and one-quarter Hutu, can assist the children in this regard. She also has knowledge of Africa and frequently speaks with the children in Swahili. In addition, there was evidence that Tom and Sally are sensitive to the issues of the children's African heritage.
It is true that Abel may be in a better position to help the children maintain their cultural and ethnic identity. Because Lucy and her mother lived in Zaire and she left Africa at about age eleven, her knowledge of Rwanda and its tribal culture is limited. Tom is much more knowledgeable about African culture than most Americans, but his knowledge does not extend to that of the Tutsi tribe and the countries of Rwanda and Burundi. It is unfortunate that Tom and Sally have not made any real effort to expose the children to individuals who can teach them African ways. To the contrary, their own testimony reveals that they have isolated the children from the children's family members and from Africans in the Kansas City community. They think that it is disruptive for the children to have contact with persons who believe the children should reside in an African home.
The court was not persuaded by their opinions, however, as the trial court's order directed Tom and Sally to permit contact with the family by allowing "reasonable contact with Petitioners [Judy and Abel] through letters, telephone calls, internet messages, if reasonably available, videotaped communication, and, if possible without undue expense and by agreement of the guardians, in-person visitation." The children's best interest requires that the contact between the children and their family be maximized. It would also be beneficial for them to have meaningful contact with Africans in Kansas City. The fact that contact with family and other Africans causes the children to be upset and to have conflicting feelings is an issue to be addressed, not avoided.
The court's appointment of Tom and Sally as guardians and conservators allows the children to maintain their relationship with Lucy with whom they have lived as sister and brother for the last five years, while providing for as much contact with Abel and Judy as circumstances allow. When considered in the overall context of the primary concerns of stability and environment, this court does not firmly believe that the trial court's decision is against the weight of the evidence or a misapplication of the law. Point denied.
In his fifth point on appeal, Abel claims that the trial court erred by failing to elicit the preferences of the children before choosing Tom and Sally to be their joint guardians and conservators. Abel contends that the trial court's failure to determine the children's preferences violated a duty imposed by both statutory and case law.
Abel's claim is premised upon § 452.375, which governs custody determinations in dissolution of marriage proceedings, and upon the cases which apply this statute. Section 452.375.2 provides that a trial court shall consider all relevant factors in determining the custody of a child, and § 452.375.2(2) states that these factors shall include the child's own wishes as to a custodian. However, there is no authority for the proposition that § 452.375 governs guardianship proceedings. Even under § 452.375.2(2), the trial court is not compelled to consider the child's wishes, as "the decision whether to ascertain such wishes through an in-chambers interview of the child is discretionary with the trial court." Osmun v. Osmun, 842 S.W.2d 932, 936 (Mo. App.1992). See also Hord v. Morgan, 769 S.W.2d 443, 449 (Mo.App.1989). If the trial court does not elect to interview the child, *923 then the statute has no application. Osmun, 842 S.W.2d at 936.
The guardianship code controls and, under the code, a minor over the age of fourteen and without a qualified, living parent has a right to choose a guardian or conservator, unless the designated person is found to be unfit or the appointment is contrary to the best interests of the minor. Section 475.045, RSMo 1994. There is no requirement in the code that the court consider the preference of a child fourteen or under, when appointing a guardian or conservator.
Nevertheless, evidence of a child's preference may be a legally relevant factor in a guardianship proceeding, and, therefore, admissible. Here, Abel had the opportunity to call the children during the proceedings to inquire as to their wishes. Nothing in the record reflects that Abel requested and was denied the opportunity to call the children as witnesses. The trial court even spoke with the children on the record at the end of the case, yet Abel did not request that the court ask the children any questions concerning their preference for custody. Therefore, Abel cannot claim reversible error for the trial court's failure to inquire as to the childrens' wishes when he chose not to do so. Khulusi v. Southwestern Bell Yellow Pages, Inc., 916 S.W.2d 227, 231 (Mo.App.1995) (appellate court will not find reversible error on issue not presented before trial court for decision). Point denied.
In his sixth point on appeal, Abel claims that the trial court erred by appointing Tom and Sally as guardians and conservators, and by denying his competing petition, because the guardian ad litem failed to exercise her statutory duty to represent the best interests of the children. Abel contends that the guardian ad litem failed to "(1) contact any witnesses with relevant evidence, (2) ascertain the wishes, feelings, attachments, and desires of the children, (3) explore the African heritage of the children, and (4) conduct proper cross examination."
Section 452.423.2(2) provides that, if appointed in any proceeding for child custody, the guardian ad litem shall "conduct all necessary interviews with persons having contact with or knowledge of the child in order to ascertain the child's wishes, feelings, attachments and attitudes," and that, "[i]f appropriate, the child shall be interviewed." Abel contends that the guardian ad litem failed to satisfy these statutory duties.
As a threshold matter, this court must note that there is no indication in the record that Abel made any objection concerning the performance of the guardian ad litem or the adequacy or effectiveness of her representation of the children's interests. Therefore, Abel has failed to preserve this issue for appeal because it was never presented to or passed on by the trial court. In re Marriage of Campbell, 868 S.W.2d 148, 151 (Mo.App. 1993).
Nevertheless, this court elects to review Abel's point for plain error pursuant to Rule 84.13(c) since the best interests of the children are involved. Id. In civil cases, the plain error doctrine is rarely resorted to, and relief is available for plain error only in cases of manifest injustice or a miscarriage of justice. Brown v. Mercantile Bank of Poplar Bluff, 820 S.W.2d 327, 335 (Mo.App.1991).
Plain error relief is not merited by Abel's complaints concerning the guardian ad litem's conduct. Although the record filed by Abel omitted the transcript of the guardian ad litem's oral report to the court of her efforts on behalf of the children, that portion of the record was provided by the guardian ad litem in the Supplemental Legal File. She reported that she took the following steps to ascertain the best interests of the children: (1) on 9/10/94, she met with Tom, Sally, Frank, Joela, and Lucy; (2) on 9/20/94, she talked by telephone with Abel and his wife; (3) on 11/12/94, she supervised Abel's wife's visitation with Frank and Joela; (4) on 11/15/94, she talked by telephone with Joela's teacher, visited Frank at his school, and reviewed a video sent by Abel and his wife; (5) on 11/17/94, she supervised a visitation with Abel, his wife, and the children; and (6) on 11/22/94, she talked again with the children at her office. Also, she had numerous conversations with the attorneys involved in this case in order to gather background information. *924 In addition, during the trial, she conducted a cross-examination of Tom, Sally, Abel, Abel's wife, Lucy, and Joela's teacher.
This record does not reflect a manifest injustice or a miscarriage of justice because of any failure on the part of the guardian ad litem to adequately represent the interests of the children. Point denied.
The judgment of the trial court is affirmed.
All concur.
NOTES
[1] To protect the anonymity of the children, the court addresses the children and their family by the English forenames they used in Africa. Other persons have been given fictitious forenames.
[2] All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise indicated.
[3] When Claude was sixteen, he moved out of Rose's home to live with a friend.
[4] The provision in Rose's will appointing persons to serve as Lucy's guardian and conservator would be effective under § 475.045.1(3), if Rose was found to be Lucy's last surviving parent. It would have no force as to Frank and Joella, however, because Rose was not their natural mother.
[5] At the time of Rose's death, Marara was in the process of moving because of the conflicts in Burundi and was unavailable to take care of the children.
[6] Section 452.445(2) states that the types of custody proceedings covered by the UCCJA include an action for "appointment of a guardian of the person." Accordingly, it has been held that the Missouri version of the UCCJA applies to the appointment of a guardian of the person of a minor. In re Estate of Patterson, 652 S.W.2d 252, 254 (Mo.App.1983).
[7] In their brief, Tom and Sally contend that Glanzner v. State, DSS, 835 S.W.2d 386 (Mo.App. 1992) is a case construing the temporary absence provision of § 452.445(4) in the context of a determination of home state status. However, when § 452.445(4) is quoted in Glanzner, the sentence referring to the temporary absence provision is noticeably excluded. Id. at 390. In fact, in Glanzner, the Eastern District relied not on the temporary absence provision which adds the period of absence to the six-month calculation, but instead found that the six-month period needed to establish home state status pursuant to § 452.450.1(1)(b) was met even when subtracting the period of absence. Id.